**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

**YAMMARII LONG, JOSE GUARDADO, and NICOLE HUGHES, individually and on behalf of all others similarly situated,**

***Plaintiff*,**

**v.**

**ORACLE CORPORATION, LKQ CORPORATION, THE UNIVERSITY OF PHOENIX, INC.,**

***Defendants*.**

Case No.: 1:25-cv-2072

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Yammarii Long, Jose Guardado, and Nicole Hughes, ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Defendants, Oracle Corporation ("Oracle"), LKQ Corporation ("LKQ"), and The University of Phoenix, Inc., ("Phoenix") (collectively, "Defendants") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard the personally identifiable information ("PII" or "Private Information") of Plaintiffs and Class Members (later defined).

2. Plaintiffs and Class Members are current or former employees of Defendants. Plaintiffs and Class Member's personal information was entrusted to Defendants on the mutual understanding that Defendants would protect it against unauthorized disclosure.

3. Defendant Oracle provides a wide range of services including cloud computing (Oracle Cloud Infrastructure and cloud applications), database software, and enterprise applications for managing business operations. This action involves Oracle's E-Business Suite (EBS) which is used for financial management, logistics, human capital management, and other business needs.[1]

4. Upon information and belief, Defendants used Oracle EBS for their business needs, which included the collection, transfer, and storage of Plaintiffs' PII in their respective Oracle EBS instances.

5. In, or around, September 2025, a cybercriminal group known as Cl0p began notifying company executives from compromised Oracle EBS accounts that it had accessed and exfiltrated PII from their organization (hereafter referred to as the "Data Breach").[2] In those emails, Cl0p provided proof of the Data Breach, including screenshots and file trees, and demanded a ransom of up to $50,000,000.00.[3]

6. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

7. The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable data protection procedures necessary to protect consumers' PII from a foreseeable and preventable risk of unauthorized disclosure. Had Defendants remedied the vulnerabilities in

[1] https://www.oracle.com/applications/ebusiness/#solutions
[2] https://cyberscoop.com/clop-claims-oracle-customers-data-theft
[3] https://cybernews.com/cybercrime/google-warns-executives-targeted-hacker-extortion-emails

its information technology environment, and implemented administrative, technical, and physical controls consistent with industry best practices, this Data Breach could have been prevented.

8. Defendants' conduct resulted in the unauthorized disclosure of Plaintiffs' Private Information to unknown cybercriminals. The unauthorized disclosure of Plaintiffs' PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendants' failure to adequately secure the PII in their custody, and has resulted in actual, particularized, and concrete harm to the Plaintiffs. Plaintiffs suffered actual injury in the form of damages to and diminution in the value of the PII that was compromised as a result of the Data Breach. The injuries Plaintiffs suffered, as described herein, can be redressed by a favorable decision in this matter.

9. Defendants have not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendants have modified their data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

10. Defendants' conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft or fraud. The circumstances demonstrating a substantial risk of future identity theft or fraud, include, but are not limited to:

a. **Data Breach Type**: In, or around, September 2025, Cl0p ransomware group began emailing Oracle EBS customers that it had stolen sensitive data from their Oracle EBS instance. The vulnerability in the Oracle EBS that was exploited by Cl0p was assigned a "critical" severity rating of 9.8. Cl0p is a well-known cybercriminal, who is responsible for other similar campaigns affecting Cleo, MOVEit, and Fortra file transfer products.[4] Cl0p is a financially motivated cyberextortion group.

b. **Data Misuse**: On October 23, 2025, Cl0p leaked the data it acquired in the Data Breach on the dark web.[5] The dark web uses a series of encrypted networks to

---

[4] https://www.securityweek.com/oracle-e-business-suite-zero-day-exploited-in-cl0p-attacks

[5] *See, e.g.*, https://www.dexpose.io/clop-ransomware-strikes-lkq-corporation/#:~:text=October%2023%2C%202025,time%E2%80%94before%20damage%20spreads%20internally.

> hide users' identities, which makes it convenient for criminals to buy and sell illegally obtained data. Many criminals purchase stolen personal data off the dark web before launching social engineering-based attacks. A social engineering attack is a method of using psychological manipulation to deceive a victim and gain access to a computer system or to steal sensitive information such as login credentials. Social engineering attacks that can be launched using names, telephone numbers and email addresses include phishing, smishing (SMS message), vishing (voice messaging), pretexting, and baiting attacks.

11. The imminent risk of future harm resulting from the Data Breach is traceable to the Defendants' failure to adequately secure the PII in their custody, and has created a separate, particularized, and concrete harm to the Plaintiffs.

12. More specifically, the Plaintiffs' exposure to the substantial risk of future identity theft or fraud caused them to: (i) spend money on mitigation measures like credit monitoring services and dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiffs suffered can be redressed by a favorable decision in this matter.

13. Plaintiffs face a substantial risk of future spam, phishing, or other social engineering attacks where their full names, addresses, email addresses, and phone numbers were stolen by a hacker group known for stealing and reselling personal data on the dark web. Names, telephone numbers and email addresses can be used by cybercriminals to launch social engineering attacks designed to trick individuals into giving away sensitive information. Plaintiffs seek to recover expenses incurred for purchasing products to protect from phishing, smishing (SMS message), vishing (voice messaging), pretexting, and other social engineering-based attacks.

14. Armed with the PII acquired in the Data Breach, data thieves have already engaged in identity theft and fraud and can, in the future, commit a variety of crimes including, opening

new financial accounts, taking out loans, using Plaintiffs' information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

15. As a result of the Data Breach, Plaintiffs suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

16. Plaintiffs bring this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendants' inadequate protection of PII that it collected and maintained, and for failing to provide timely and adequate notice of the Data Breach.

17. Plaintiffs have a continuing interest in ensuring that their personal information is kept confidential and protected from disclosure, and Plaintiffs should be entitled to injunctive and other equitable relief.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C.§1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed

class, and at least one member of the class, including Plaintiffs, is a citizen of a state different from Defendant.

19. This Court has personal jurisdiction over Defendants because they regularly conduct business within this District, and the acts or omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

20. Venue is proper under 28 U.S.C §1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## PARTIES

21. Plaintiff Yammarii Long is an adult resident and citizen of Nashville, Tennessee.

22. Plaintiff Jose Guardado is an adult resident and citizen of Palm Coast, Florida.

23. Plaintiff Nicole Hughes is an adult resident and citizen of Las Vegas, Nevada.

24. Defendant Oracle Corporation maintains a principal place of business at 2300 Oracle Way, Austin, Texas 78741. Defendant may be served via its registered agent CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

25. Defendant LKQ Corporation maintains a principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661. Defendant may be served via its registered agent Corporate Creations Network Inc., 2595 N. Dallas Parkway, Suite 350, Frisco, Texas 75034.

26. Defendant The University of Phoenix, Inc., maintains a principal place of business at 4035 S. Riverpoint Parkway Phoenix, Arizona 85040. Defendant may be served via its registered agent CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

27. At all times material hereto, Defendants used Oracle EBS to process Plaintiffs and Class Members' Private Information.

## FACTUAL ALLEGATIONS

28. Plaintiffs and Class Members (later defined) are current and former employees of Defendants.

29. During their relationship, Plaintiffs and Class Members, provided Defendants with at least the following: full names, dates of birth, contact information, financial information, health insurance information, and Social Security number.

30. When collecting PII from employees, including Plaintiffs and Class Members, Defendants undertook a common law duty to use reasonable technical, administrative, and physical safeguards to protect the confidentiality of the Private Information they collected.

31. Plaintiffs and the Class Members, as employees of Defendants, relied on these sophisticated business entities to keep their PII confidential, securely maintained, and to make only authorized disclosures of this information.

32. Defendant Oracle provides various cloud computing solutions to companies throughout the United States, including the Oracle E-Business Suite (EBS). Defendants used Oracle EBS to collect, use, and/or store Plaintiffs and Class Members' Private Information as part of their business operations.

33. Defendants stored Plaintiffs' and Class Members unencrypted Private Information on their respective networks, including their respective Oracle EBS instance. By collecting, sharing, and storing Plaintiffs and Class Members' Private Information, Defendants were able to derive an economic benefit as part of their respective business practices. In exchange, Defendants represented they would maintain the security of that information and only make authorized disclosures.

34. Unfortunately, Defendants failed to implement reasonable safeguards to protect the Private Information from a foreseeable risk of unauthorized disclosure, which left vulnerabilities for cybercriminals to exploit and gain unauthorized access to the data.

35. In late September 2025, the Cl0p ransomware group began sending extortion emails to various customers of Defendant Oracle's enterprise resource planning solutions, indicating the cybercrime group had gained access to PII.

36. Upon information and belief, Cl0p was able to access the Plaintiffs' and Class Members' Private Information by exploiting known vulnerabilities in the Oracle EBS.[6] Cl0p is "known to launch campaigns that involve the exploitation of vulnerabilities in software that is used by many organizations to handle sensitive data."[7]

37. Within weeks of the extortion campaign, Cl0p's leak site began naming victims of the Oracle EBS breach, which includes Defendants. Cl0p's leak site suggests even more organizations have been hit, and cybersecurity analysts estimate over 100 companies may have been impacted in total. Cl0p tends to publicly name victims (and even publish stolen files) if the targeted organization refuses to pay.[8]

***This Data Breach Was Avoidable***

38. Defendant Oracle released patches for its EBS in October, but upon information and belief, Cl0p had been exploiting vulnerabilities in Oracle EBS since July. It is still unclear exactly which Oracle EBS vulnerabilities were exploited; however, the most likely candidates are

---

[6] https://www.securityweek.com/oracle-says-known-vulnerabilities-possibly-exploited-in-recent-extortion-attacks

[7] *Id.* (Noting Cl0p and FIN11are linked entities that are known for stealing sensitive data from cloud environments).

[8] https://www.blackfog.com/clops-new-extortion-wave-hits-oracle/

CVE-2025-61882 and CVE-2025-61884, both of which can be exploited remotely without authentication or user interaction to gain access to sensitive data.[9]

39. Upon information and belief, the Data Breach was a direct result of Defendants' failure to implement reasonable data protection measures which would protect Plaintiffs' and Class Members' PII from the foreseeable and preventable risk of unauthorized disclosure.

40. To prevent data breaches of this type and detect cyber-attacks, Defendants could and should have implemented the following measures:

<u>Reasonable Protective Measures</u>

a. Implement an endpoint anti-data exfiltration (ADX) solution to prevent unauthorized data transfers.

b. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

c. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

d. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

e. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

f. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

g. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

h. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

i. Configure firewalls to block access to known malicious IP addresses.

j. Set anti-virus and anti-malware programs to conduct regular scans automatically.

[9] https://www.securityweek.com/nearly-30-alleged-victims-of-oracle-ebs-hack-named-on-cl0p-ransomware-site/

k. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

l. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

m. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

n. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

o. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

p. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

q. Execute operating system environments or specific programs in a virtualized environment.

r. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

s. Conduct an annual penetration test and vulnerability assessment.

t. Secure your backups.[10]

u. Identify the computers or servers where sensitive personal information is stored.

v. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

w. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

x. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

y. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

[10] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

z. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

aa. To detect network breaches when they occur, consider using an intrusion detection system.

bb. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

cc. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

dd. Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

ee. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[11]

41. Given that Defendants stored Private Information, Defendants could and should have implemented the above measures, as appropriate, to prevent data loss or cyberattacks. Defendants failed to adequately implement encryption, Data Loss Prevention (DLP), patch management, anti-data exfiltration (ADX) solutions, and other measures, resulting in the Data Breach and the exposure of Plaintiffs' and the Class Members' PII.

42. Defendants knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding customer PII and of the foreseeable consequences if a Data Breach were to occur, including the significant cost that would be imposed on Plaintiffs and the Class as a result.

---

[11] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

***Plaintiffs and Class Members Sustained Damages in the Data Breach***

43. The invasion of the Plaintiffs' and Class Members' privacy suffered in this Data Breach constitutes a redressable injury.

44. Additionally, Plaintiffs and Class Members face a substantial risk of future identity theft or fraud where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker group known for stealing and reselling sensitive data on the dark web.

45. Furthermore, Plaintiffs and Class Members face a substantial risk of future spam, phishing, or other social engineering attacks where their full names and contact information were stolen and subsequently released on the dark web.

46. Upon information and belief, Cl0p has acquired enough personal information for a criminal to be able to open a bank account or commit other fraud using the information stolen in the Data Breach. A criminal can easily link data acquired in the data breach with information available from other sources to commit a variety of identity theft related crimes.

47. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[12] With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

[12] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texaslife-insurance.

48. Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the hacker group's behavior in prior data breaches, and the type of PII involved in the Data Breach, there is a substantial probability that entire batches of stolen information have been placed, or will be placed, on the dark web for purchase by criminals intending to utilize the PII for identity theft crimes.[13]

49. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records. Several federal and state agencies have recommended steps that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[14]

50. Consequently, Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach. Additionally, the retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

51. Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[15] Data such as name, address, phone number, and credit history has

---

[13] By way of example, GlobalLogic reported to the Maine Attorney General that personal data of nearly 10,500 employees including names, contact info, birth dates, passport and Social Security numbers, and bank details, were exposed through the Oracle EBS hack.

[14] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[15] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers

been sold at prices ranging from $40 to $200 per record.[16] Sensitive PII can sell for as much as $363 per record.[17]

52. As a result of the Data Breach, Plaintiffs', and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

53. Given these facts, Defendants have deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to provide Defendant their Private Information, Plaintiffs and Class Members understood and expected that Defendants would protect their personal data, when in fact, Defendants did not provide adequate security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

54. Through this Complaint, Plaintiffs seeks redress for the damages and injuries that resulted from the Data Breach.

***Plaintiffs' Experiences***

Plaintiff Yammarii Long

55. Plaintiff Yammarii Long provided his Private Information to Defendant LKQ and Defendant Oracle as a condition of his employment.

---

[16] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark/

[17] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

56. Plaintiff Long is a reasonably cautious person and is therefore careful about sharing his sensitive Private Information, Plaintiff diligently protects his Private Information and securely stores any documents containing Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

57. Plaintiff Long only allowed Defendants to maintain, store, and use his Private Information because he believed that he was required to do so and that Defendants would use reasonable and appropriate security measures to protect his Private Information.

58. Upon information and belief, Plaintiff Long's Private Information was within the possession and control of Defendants at the time of the Data Breach and remains in their possession.

59. Plaintiff Long would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

60. In the instant that his Private Information was accessed by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy. Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendants. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

61. Plaintiff Long has spent time responding to the Data Breach and will spend additional time on efforts to mitigate the impact of the Data Breach, valuable time he otherwise would have spent on other activities. This time has been lost forever and cannot be recaptured.

62. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff

to suffer stress, fear, and anxiety, which has been compounded by the fact that Defendant still has not fully informed him of key details about the Data Breach's occurrence or the information stolen.

Plaintiff Jose Guardado

63. Plaintiff Jose Guardado provided his Private Information to Defendant Oracle as a condition of his employment.

64. Plaintiff Guardado is a reasonably cautious person and is therefore careful about sharing his sensitive Private Information, Plaintiff diligently protects his Private Information and securely stores any documents containing Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

65. Plaintiff Guardado only allowed Defendants to maintain, store, and use his Private Information because he believed that he was required to do so and that Defendants would use reasonable and appropriate security measures to protect his Private Information.

66. Upon information and belief, Plaintiff Guardado's Private Information was within the possession and control of Defendants at the time of the Data Breach and remains in their possession.

67. Plaintiff Guardado would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

68. In the instant that his Private Information was accessed by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy. Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendants. This information has inherent value that Plaintiff

was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

69. Plaintiff Guardado has spent time responding to the Data Breach and will spend additional time on efforts to mitigate the impact of the Data Breach, valuable time he otherwise would have spent on other activities. This time has been lost forever and cannot be recaptured.

70. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety, which has been compounded by the fact that Defendant still has not fully informed him of key details about the Data Breach's occurrence or the information stolen.

Plaintiff Nicole Hughes

71. Plaintiff Nicole Hughes provided her Private Information to Defendant Pheonix as a condition of her employment.

72. Plaintiff Hughes is a reasonably cautious person and is therefore careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and securely stores any documents containing Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

73. Plaintiff Hughes only allowed Defendants to maintain, store, and use her Private Information because she believed that she was required to do so and that Defendants would use reasonable and appropriate security measures to protect her Private Information.

74. Upon information and belief, Plaintiff Hughes Private Information was within the possession and control of Defendants at the time of the Data Breach and remains in their possession.

75. Plaintiff Hughes would not have provided her Private Information to Defendants had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

76. In the instant that her Private Information was accessed by a third party without her consent or authorization, Plaintiff suffered injury from a loss of privacy. Plaintiff has been further injured by the damages to and diminution in value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendants. This information has inherent value that Plaintiff was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

77. Plaintiff Hughes has spent time responding to the Data Breach and will spend additional time on efforts to mitigate the impact of the Data Breach, valuable time she otherwise would have spent on other activities. This time has been lost forever and cannot be recaptured.

78. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety, which has been compounded by the fact that Defendant still has not fully informed her of key details about the Data Breach's occurrence or the information stolen.

## CLASS ALLEGATIONS

79. Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

80. The Class that Plaintiffs seeks to represent is defined as follows:

**All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class" or "Class Members").**

81. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

82. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

83. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. While the exact number of Class Members is unknown to Plaintiffs at this time and such number is exclusively in the possession of Defendant.

84. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, including the following:

a. Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendants had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

e. Whether and when Defendants learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

85. Typicality: Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

86. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

87. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights, and the damages suffered are

typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

88. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

89. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

90. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

91. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

92. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII of Class, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

93. Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

94. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiffs and the Class of the Data Breach;
b. Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PII;
c. Whether Defendants' (or their vendors') security measures to protect its network were reasonable in light of industry best practices;
d. Whether Defendants' (or their vendors') failure to institute adequate data protection measures amounted to negligence;
e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII;
f. Whether Defendants made false representations about their data privacy practices and commitment to the security and confidentiality of personal information; and

g. Whether adherence to FTC recommendations and best practices for protecting personal information would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE/WANTONNESS

95. Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

96. Defendants required Plaintiffs and Class Members to submit PII in the ordinary course of hiring and retaining employees.

97. Defendants gathered and stored the PII of Plaintiffs and Class Members as part of their business. Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would adequately safeguard their information.

98. Defendants had full knowledge of the types of PII they collected and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

99. By collecting, storing, sharing, and using the Plaintiffs' and Class Members' PII for commercial gain, Defendants assumed a duty to use reasonable means to safeguard the personal data they obtained.

100. Defendants' duty to employ reasonable security measures was also a reasonable and fair business practice. Defendants were prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information

is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

101. Similarly, the Texas Deceptive Trade Practices Act requires entities doing business in Texas to maintain reasonable procedures to protect sensitive personal information from unauthorized uses and disclosures. Tex. Bus. & Com. Code §521.052.

102. Guided by the security practices and industry standards listed herein, Defendants' independent duty included a responsibility to ensure they: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized disclosures of Private Information; (ii) conducted regular privacy assessments and data security audits; (iii) deleted data they were no longer required to maintain; and, (iv) provided timely notice to individuals impacted by a data breach event. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

103. Defendants breached their duty by failing to use reasonable measures to protect PII. The specific negligent/wanton acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to implement organizational controls, including a patch management policy to track and manage updates and patches for known vulnerabilities.

b. Failing to have defined periods when patches must be installed and/or an automated means of determining what patches are needed, where they are needed, and the status of current patch levels by location.

c. Failing to encrypt personally identifying information in transit and at rest.

d. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

e. Failing to adopt, implement, and maintain Data Loss Prevention (DLP) and/or anti-data exfiltration (ADX) solutions.

f. Failing to adequately monitor the security of their networks and cloud software.

g. Allowing unauthorized access to PII.

h. Failing to detect in a timely manner that PII had been compromised.
i. Failing to remove former customers' PII it was no longer required to retain.
j. Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

104. Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act and the Texas Deceptive Trade Practices Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statues were intended to guard against.

105. The injuries resulting to Plaintiffs and the Class because of Defendants failure to use adequate security measures was reasonably foreseeable.

106. Plaintiffs and the Class were the foreseeable victims of a data breach. Defendants knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

107. Plaintiff and the Class had no ability to protect the PII in Defendants' possession. Defendants were in the best position to protect against the harms suffered by Plaintiffs and the Class as a result of the Data Breach.

108. But for Defendants' breach of duties owed to Plaintiffs and the Class, their PII would not have been compromised. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class.

109. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual

consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

110. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

111. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

**COUNT 2: BREACH OF IMPLIED CONTRACT**

112. Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

113. Defendants required Plaintiffs and Class Members to submit PII in the ordinary course of employment. Defendants purchased and used Oracle EBS to process PII. Plaintiffs and Class Members understood that any subsequent uses or disclosures of their PII by Defendants would also be protected from unauthorized disclosure.

114. In so doing, Plaintiffs and Class Members entered implied contracts with Defendants by which Defendants agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information they collect and store.

115. Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of an expressed or implied promise to implement reasonable data protection measures.

116. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contract with Defendants.

117. Defendants breached the implied contract with Plaintiffs and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendants' web site, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information Defendants collected would be adequately protected and that the Defendants would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

118. In every contract (express or implied), there is an implied covenant of good faith and fair dealing. Defendants breached the covenant of good faith and fair dealing by failing to secure their network, failing to adequately patch vulnerabilities, failing to maintain data security practices designed to protect the character of data collected from Plaintiffs and Class Members, and failing to provide notice of the Data Breach within a reasonable time.

119. As a direct and proximate result of the Defendants breach of an implied contract, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third

parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

120. Defendants' actions destroyed or injured the Plaintiffs and Class Members' right to maintain the confidentiality and security of their Private Information that they contracted to receive. Plaintiffs and Class Members have been damaged thereby in an amount to be determined at trial.

121. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

**COUNT 3: UNJUST ENRICHMENT**

122. Plaintiffs reallege and incorporates by reference all the allegations contained in the foregoing paragraphs, as if fully set forth herein.

123. Plaintiffs bring this Count in the alternative to the breach of implied contract count above. Plaintiffs and Class Members have no adequate remedy at law.

124. By providing their PII, Plaintiffs and Class Members conferred a monetary benefit on Defendants. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit.

125. By collecting the PII, Defendants were obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been compromised or stolen.

126. By not expending the funds to encrypt Plaintiffs and Class Members data, to purchase Data Loss Prevention (DLP) and/or anti-data exfiltration (ADX) solutions, or to test their

products for exploitable vulnerabilities, Defendants were unjustly enriched at the Plaintiffs' and Class Members' expense.

127. Therefore, it would be unjust for Defendants to retain any of the benefits that Plaintiffs and Class Members conferred upon Defendants without paying value in return.

128. As a direct and proximate result of the Defendants' conduct, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

129. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

**COUNT 4: DECLARATORY JUDGMENT**

130. Plaintiffs re-allege and incorporates by reference the paragraphs above as if fully set forth herein.

131. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

132. An actual controversy has arisen in the wake of Defendants' data breach regarding their present and prospective common law and other duties to reasonably safeguard PII and whether Defendants are currently maintaining data security measures adequate to protect consumers from further unauthorized disclosures of their PII.

133. Plaintiffs alleges that Defendants' data security measures remain inadequate. Plaintiffs will continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

134. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants continue to owe a legal duty to secure current and former employees' PII and to timely notify them of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs and Class Members' PII.

135. The Court also should issue corresponding prospective injunctive relief requiring that Defendants employ adequate data protection practices consistent with law and industry standards.

136. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

137. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiffs will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

138. Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendants to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiffs and the millions of individuals whose PII would be at risk of future unauthorized disclosures.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Class alleged herein, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Class and counsel for Plaintiff(s) as Class Counsel;

B. For an order declaring the Defendants' conduct violates the statues and causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D. Ordering Defendants to pay for lifetime credit monitoring services for Plaintiffs and the Class;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief;

H. For injunctive relief as pleaded or as the Court may deem proper; and

I. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: December 18, 2025.

Respectfully Submitted,

*/s/Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

-AND-

Paul J. Doolittle, Esq.*
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

*Attorneys for Plaintiffs & Proposed Class*
**Pro Hac Vice forthcoming*